## Case No. 16,295.

### UNITED STATES v. SIX BOXES OF ARMS.

[1 Bond, 446.] [1]

District Court, S. D. Ohio. June Term, 1861.

REBELLION — SUSPENSION OF COMMERCIAL INTERCOURSE—CONTRABAND GOODS—ARMS AND MUNITIONS.

1. By the law of nations where a war exists between two distinct and independent powers, there must be a suspension of all commercial intercourse between their citizens; but this principle has not been applied to the states which joined the so-called "Southern Confederacy."

2. The destination of arms and munitions of war, and the use intended to be made thereof, at the time of seizure, must furnish a test of their status as contraband or otherwise.

Flamen Ball, U. S. Dist. Atty.
Lincoln, Smith & Warnock, for claimants.

LEAVITT, District Judge (charging jury). This is an information filed by the district attorney in behalf of the United States, praying for the condemnation and forfeiture of certain property as contraband of war. The information avers, in substance, that six boxes containing guns and other munitions of war, were shipped from the port of Baltimore on May 10, 1861, to Little Rock, in the state of Arkansas; that on the 27th of April last, and ever since, that state, with others, was, and has been, in a state of insurrection, rebellion, and war; and that the ports and places within the same have been declared by the proclamations of the president of the United States under blockade; and that the property specified in the libel was shipped to the state of Arkansas in violation of the blockade and the laws of the United States, and is legally subject to forfeiture as contraband of war. The property has been seized by and is now in the custody of the marshal, under the process of this court. William J. Syms and Samuel R. Syms, doing business in, and being citizens of the city of New York, under the name of W. J. Syms & Brother, have intervened in the case, and have filed their answer, verified by oath, in which they allege in substance, that on the 15th day of February last, at the city of New York, they entered into a written contract with two individuals, as commissioners of the state of Arkansas, by which they agreed to furnish the articles named in the information at the prices stipulated, together with others not now in controversy of the same character;

[1] [Reported by Lewis H. Bond, Esq., and here reprinted by permission.]

that pursuant to said agreement, the property was shipped, a part on the 3d and a part on the 9th of April last, from the port of New York, directed to their agent at Little Rock, in Arkansas, by way of Baltimore, and thence westward by the Baltimore and Ohio Railroad; and that the articles now in question were taken on the 17th of April, without legal warranty or authority, by a number of citizens at Cincinnati, and a day or two afterwards were delivered to the chief of police of said city for safe-keeping, until the circumstances of the shipment could be legally investigated, and were retained by him until seized by the marshal. The claimants allege that they are loyal citizens of the United States, and that at the date of said shipment there was no blockade of the ports or places within the state of Arkansas, and that none has yet been formally proclaimed, and they deny that the property, either when shipped or seized, was liable to condemnation as contraband of war. They also aver that on the 15th of February, the date of the contract, and for two months subsequently, the state of Arkansas was reputed and believed to be in favor of the Union, and that a convention of the state had voted against secession. They further allege that it was not until about the 25th of April that there were any marked indications of the purpose of the state to secede, and that the act of secession did not pass until the 7th of May, and that about the 25th of April their agent in Arkansas repaired to Cincinnati, countermanded the order for shipment to that state, and ordered all the property not delivered to be returned to New York; and that the claimants thereupon made a contract with the Union defense committee of that city for the sale to them of such of the property as should be returned to that place.

The evidence offered by the claimants sustains the allegations of their answer, as to the sale and shipment of this property and its seizure and detention at Cincinnati. The testimony of George P. Williams, in behalf of the claimants, is before the court. He was the clerk of Lyons & Brother at the time of the contract made with the Arkansas commissioners, and identifies the property libeled as a part of that furnished by the claimants, and shipped by them from New York on the 3d and 9th of April. He proceeded to Arkansas in the early part of that month, to receive and deliver the property as the agent of the claimants. He traveled a good deal through the state, and swears that while the sentiment of the people in the southern part of the state was favorable to secession, in other parts they were for the Union; and that assurances were made to him that the state would not secede. He also states that it was not until after the information was received of the proclamations of the president, of the 15th and 19th of April, that there were any decisive indications of the purpose of seceding; and that on the 25th of April

he left Arkansas, and proceeded to Cincinnati for the purpose of stopping all further shipments to Arkansas, and that such an order was given, and no further shipments were made. He also states that the claimants agreed to sell the property-to the Union defense committee of New York, when it should be returned to that place. The testimony of the witnesses to the state of things in Arkansas, prior to the 25th of April, is sustained by other witnesses offered by the claimants.

On these facts, it is insisted by the district attorney that the articles seized are liable to forfeiture: first, as having been shipped in violation of the president's proclamation of blockade; and second, that the state of Arkansas was at war with the United States, and the property was, therefore, when seized, contraband of war.

The first of these positions is clearly not sustained. The state of Arkansas was not embraced in the proclamations of the president of the 19th and 27th of April [12 Stat. 1259, 1260], declaring the ports of the seceded states under blockade. The formal act of secession by the state of Arkansas, as before stated, did not take place until the 7th of May. Until after that date the president could not properly declare the blockade of her ports; and trade with her was not, therefore, interdicted on that ground. But the question still remains whether this property was subject to condemnation as contraband of war on general principles of national law. The affirmative of this principle is strenuously urged by the attorney for the government. Without attempting an extended investigation of this subject, I propose to state some of the reasons which lead me to the opposite conclusion. And in the first place I may remark that there is no question that, by the well-settled rule of the law of nations, where a war exists between two distinct and independent powers, there must necessarily be a suspension of all commercial intercourse between them. When two nations are arrayed in war against each other, every subject and citizen of the one is regarded and treated as the enemy of the other. But does this principle apply strictly to the so-called "Southern Confederacy," or to any of the individual states which have joined it? The president of the United States, in all his proclamations and public acts, has cautiously avoided the recognition of the Southern Confederacy, as an independent sovereignty, and has properly proceeded on the doctrine that the right of secession has no warrant in the constitution, and that the exercise of the right is simply a nullity; and when attempted to be sustained by arms, it places all who give aid or countenance to the movement in the attitude of rebels against the government. It results from this view, that every citizen of a seceding state is not necessarily to be regarded as an enemy, with whom all commercial intercourse is to be prohibited. The government of the United States has acted on the principle, in the case of western Virginia and eastern Tennessee, that the people of these sections, though within the geographical limits of seceded states, are to be viewed as loyal, and entitled to the sympathy and protection of the government.

But this view of the subject seems to have no practical application to the case before the court. At the time of the shipment of the property described in the libel, and at the time of its stoppage at Cincinnati, Arkansas had not seceded from the Union; nor does the evidence warrant the conclusion, that the state of things there was such as to render i probable she would take this course. In fact there were no indications of this until the assault upon and surrender of Fort Sumter had rendered it a political necessity, that the president should call on the states for a force sufficient to subdue the rebellion then palpably existing. This requisition was made on the 15th of April, and included Arkansas as a loyal state, and was followed on the 19th of that month, by a proclamation declaring the seceded states in a state of blockade These acts, in Arkansas as in other states, excited all the slumbering elements of secession, which in the case of that state culminated in the passage of the ordinance of the 7th of May.

There is, however, a view of the case before the court, which seems clearly to warrant the conclusion, that this property was in no sense contraband of war, when seized as such at Cincinnati. The destination and the use intended to be made of the property at the time of its seizure, must furnish the tests of its status, as contraband or otherwise. If there were grounds for the presumption of a disloyal motive in the sale and shipment of the property, no such presumption is warranted in regard to it, when taken by the marshal on the 23d of May. The evidence already referred to clearly establishes the fact, that the agent of the claimants, upon the first intimation of a probability that Arkansas might adopt the ordinance of secession, repaired to Cincinnati, and promptly directed that the property should not be sent according to its original destination, but should be forwarded to New York. It was not then in transitu to Arkansas, nor could it by possibility ever reach that state, as it was under an order for shipment for New York, to be there used in defense of the Union. In the light, then, of this fact, negativing, as it does, every presumption of a disloyal or unpatriotic purpose on the part of the claimants, I do not feel that I am justified in a decree, which not only forfeits the property in question, but would place a stigma on their reputation, which their conduct has not merited. And the view here stated is corroborated by the circulars of the secretary of the treasury of the 2d of May and the 12th of June. In both these papers, the secretary enjoins great vigilance on the part of collectors in preventing the shipment of contraband goods

to seceded states, or where there is just reason to suppose they will be used by persons in rebellion against the government. If satisfied that the property is not intended to be used for any unlawful purpose, they 'are merely to notify the shipper or his agent of the fact and the cause of the detention. In the order of the 12th of June, this clause occurs: "If any such shipment, personally or by agent, shall satisfy you that the merchandise so arrested will not be sent to any place under insurrectionary control, but will be either returned whence it came, or be disposed of in good faith for consumption within loyal states, you will restore possession of the same, and allow such disposition to be made thereof, as the parties in interest may desire." Under this instruction, with the knowledge that the property of the claimants had been ordered to New York, the officer of the customs would have been fully justified in restoring it, without any further investigation.

The case, then, before the court is that of a loyal citizen of a loyal state, whose property has been libeled for condemnation, and who has availed himself of his legal right to assert his claim, and to show that there is nothing in the facts to warrant a decree of forfeiture. In making this remark, I am not to be understood as intimating that the public officer at whose instance the seizure was made, is in any degree censurable. So far from this, it is probable that under the circumstances supposed to exist, the institution of this proceeding was a proper act of official duty. And I do not see any ground on which a certificate of probable cause of seizure, if applied for, could be refused by the court. But this is a wholly different question from that involving the legal right to the property, and its liability to condemnation and forfeiture. There may be good reasons for the seizure of property; and yet upon a full investigation of the facts, no sufficient ground for holding that the owner has forfeited his right to it.

With these views, I can do no otherwise than decree in favor of the claimants, and order the restoration of the property to them.